**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ADAIRIUS DE'AIRRICK NORWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 4:23-cv-1934 |
| ) | |
| EQUIFAX INFORMATION SERVICES ) | JURY TRIAL REQUESTED |
| LLC; EXPERIAN INFORMATION ) | |
| SOLUTIONS, INC..; and TRANS UNION, ) | |
| LLC, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

ADAIRIUS DE'AIRRICK NORWOOD ("Norwood" or "Plaintiff") brings this Complaint against Equifax Information Services, LLC ("Defendant Equifax" or "Equifax"), Experian Information Solutions, Inc. ("Defendant Experian" or "Experian"), and Trans Union, LLC ("Defendant Trans Union" or "Trans Union") (collectively, "Defendants"), for actual, statutory, and punitive damages, costs, and attorney's fees, for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of Defendants' mixing and merging of Plaintiff's credit files, credit history, and identifying information with that of his twin sister.

## INTRODUCTION

1. In fact, for nearly all his adult life, Plaintiff has been denied his own individual credit report because some or all of his personal credit information has been merged and mixed into his twin sister's credit files and reports by each of the Defendants. This occurred even though his twin sister is the opposite sex, has an

entirely different first name, middle name, and Social Security number than Plaintiff.

2. Consequently, Plaintiff has suffered, and continues to suffer damages, including denial of credit, lost credit opportunities, reputational harm, invasion of privacy, emotional distress, physical illness, embarrassment, and humiliation.

## PRELIMINARY STATEMENT

3. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual citizens. Data technology, whether it be used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individuals to flow immediately to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should benefit from the resulting convenience and efficiency.

4. Unfortunately, however, this information has also become readily available for and subject to mishandling and misuse. Individuals can sustain substantial damage, both emotionally and economically, whenever inaccurate information or fraudulent information is disseminated about them.

5. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6. The CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, automobile dealers, potential employers, and other similar interested

parties) information commonly called "consumer reports," concerning individuals who may be applying for retail credit, to lease an apartment, to obtain a mortgage, auto loan, employment, or the like.

7.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064(AJT/TRJ), 2011 E.S. Dist. LEXIS 28896, *1, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

8.     Congress made the following findings when it enacted the FCRA in 1970:

1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

3) Consumer reporting agencies have assumed a vital role in assembling and evaluation consumer credit and other information on consumers.

4) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4). Thus, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.     Since 1970, when Congress enacted the FCRA, as amended, 15 U.S.C.

§ 1681 *et seq.*, federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

10. "Mixed files" create a false description and representation of a consumer's credit history.

11. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

12. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

13. Mixed files are not a new phenomenon. Equifax, Experian, and Trans Union have been put on notice of the existence of mixed files and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

14. More recently, all three credit bureaus, Equifax, Experian, and Trans Union, have been the subject of numerous state attorney general actions relating to their mixed file problems.

15. In 2012, Ohio Attorney General Mike DeWine initiated a multistate investigation of the credit reporting practices of consumer reporting agencies Experian, Trans Union and Equifax, including the incidence of mixed files. Thirty-

one states participated in the enforcement action, which resulted in a $6,000,000 settlement with Experian, Equifax, and Trans Union.[1] Pursuant to the settlement, the three CRAs promised, among other things, "to implement an escalated process for handling complicated disputes – such as those involving . . . mixed files — where one consumer's information is mixed with another's."[2]

16.     In another example, in 2015, the New York Attorney General filed charges and settled claims with Equifax, Experian, and Trans Union over mixed files. *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*[3]

17.     Notwithstanding Equifax, Experian, and Trans Union's notice and being subject to repeated enforcement actions, mixed files persist despite consumers' unique personal identifying information, such as Social Security numbers, dates of birth, and addresses.

18.     Further, mixed files result in the disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.

---

[1]     https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-announces-6-million-settlement-credit-reporting-agencies (last visited May 17, 2023).

[2]     *Id.*

[3]     https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three (Last visited May 17, 2023); https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf (Last visited May 17, 2023).

19.    Equifax, Experian, and Trans Union have each been sued thousands of times wherein an allegation was made that Equifax, Experian, and Trans Union violated the FCRA. Moreover, Equifax, Experian, and Trans Union are sued, at a minimum, hundreds of times each year wherein an allegation is made that they mixed a consumers' credit file with that of another person.

20.    Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

21.    For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them dispute Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

22.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

23.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' numerous disputes. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

24.     Most recently, a jury assessed a $60 million verdict against Trans Union for mixing innocent American citizens with terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC,* No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020). Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

25.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co.*

*of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

26.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

27.     Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including Equifax, Experian, and Trans Union, to review their procedures when a mixed file case occurs.

28.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

### THE PARTIES

**Plaintiff Adairius De'Airrick Norwood**

29.     Plaintiff Adairius De'Airrick Norwood ("Norwood") is a natural person who resides in the City of Houston, State of Texas and is a "consumer" as defined by the FCRA at 16 U.S.C. § 1681a(c).

**Defendant Equifax Information Services LLC**

30.     Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a foreign limited liability company authorized to do business in the State of Texas, including in the Southern District.

31.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling,

evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

### Defendant Experian Information Solutions, Inc.

32. Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a foreign limited liability company authorized to do business in the State of Texas, including in the Southern District.

33. Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

### Defendant Trans Union, LLC

34. Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a foreign limited liability company authorized to do business in the State of Texas, including in the Southern District.

35. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

### JURISDICTION AND VENUE

36. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

38.     The FCRA is a comprehensive statutory scheme governing the conduct of CRAs such as Defendants. When Congress enacted the FCRA it found that the "banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1).

39.     Congress recognized that CRAs such as Defendants Equifax, Experian, and Trans Union "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

40.     In enacting the FCRA, Congress was not only concerned about the credibility of the banking system and the privacy of consumers. It also recognized a need to "prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No.91-517, 91st Cong., 1st Sess. 1 (1969).

41.     More recently, according to the Consumer Financial Protection Bureau, "As the range and frequency of decisions that rely on credit reportshave increased, so has the importance of assuring the accuracy of these reports."[4]

42.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

43.     The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

44.     Information on a consumer report is inaccurate when it is "'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse'" effect." *Dalton v. Capital Associated Indus.,* 257 F.3d 409, 415 (4th Cir. 2001) (citation omitted).

## The Credit Bureaus' Processing of Credit Information

45.     The three major credit bureaus, Equifax, Experian, and Trans Union, regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information

---

[4]     Consumer Financial Protection Bureau, <u>Key Dimensions and Processes in the U.S. CreditReporting System</u>, at 5 (December 2012).

vendors, and others.

46.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

47.    Equifax, Experian, and Trans Union collect information from thousands of furnishers.

48.    The process by which Equifax, Experian, and Trans Union receive, sort, and store information is largely electronic.

49.    Furnishers report credit information to Equifax, Experian, and Trans Union using coded tapes that are transmitted to Equifax, Experian, and Trans Union on a monthly basis through software known as Metro 2.

50.    Equifax, Experian, and Trans Union take the credit information reported by furnishers and create consumer credit files.

51.    Equifax, Experian, and Trans Union maintain credit files on more than 200 million consumers.

52.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

### The Credit Bureaus' Mixed File Problem

53.    Equifax, Experian, and Trans Union know that different consumers can have similar names.

54.    Equifax, Experian, and Trans Union know that different consumers can have similar Social Security numbers.

55.     Equifax, Experian, and Trans Union know that different consumers with similar names can also have similar Social Security numbers.

56.     Equifax, Experian, and Trans Union know that public records often do not contain identifying   information such as Social Security numbers or dates of birth.

57.     Equifax, Experian, and Trans Union match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

58.     Equifax, Experian, and Trans Union accomplish this matching of credit information to consumer credit files using certain matching algorithms or database rules.

59.     Sometimes Equifax, Experian, and Trans Union's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a mixed or merged credit file.

60.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the three major CRAs, Equifax, Experian, and Trans Union, regarding their significant failures and deficiencies with respect to mixed files.

61.     Despite Equifax, Experian, and Trans Union's long-standing and specific

knowledge of the mixed file problem, Plaintiff's credit reports were still generated by Equifax, Experian, and Trans Union containing information belonging to another consumer.

62. A mixed or merged credit file is the result of Equifax, Experian, and Trans Union inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

63. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Equifax, Experian, and Trans Union to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

64. The success or failure of these algorithms and rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Equifax, Experian, and Trans Union.

65. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Equifax, Experian, and Trans Union.

66. These rules also determine which credit files are selected by the algorithm and merged to create a complete consumer report.

67. Therefore, a mixed consumer report is sometimes the result of the mixing

of two or more consumer credit files belonging to different consumers into one consumer report.

**Capital One Denies Plaintiff's Credit Card Application in May 2021**

68.    On or about May 25, 2021, Plaintiff needed a credit card and applied online for a Capital One Card. After submitting a credit application, Plaintiff received correspondence from Capital One informing him that his credit application was denied based on the contents of his credit reports.

69.    Capital One relied on the contents of the merged and mixed credit reports and files that were sent to it by one or more Defendants at the time it denied Plaintiff's credit application on or about May 25, 2021.

70.    Defendants' inaccurate credit reporting adversely impacted Plaintiff's credit scores and caused his credit application to be denied by Capital One.

**Goldman Sachs Denies Plaintiff's Credit Card Application in November 2021**

71.    On or about November 10, 2021, Plaintiff needed a credit card and applied online for an "Apple Card" with Goldman Sachs. After submitting a credit application, Plaintiff received correspondence from Goldman Sachs informing him that his credit application was denied based on the contents of his credit reports.

72.    Goldman Sachs relied on the contents of the merged and mixed credit reports and files that were sent to it by one or more Defendants at the time it denied Plaintiff's credit application on or about November 10, 2021.

73.    Defendants' inaccurate credit reporting adversely impacted Plaintiff's credit scores and caused his credit application to be denied by Goldman Sachs.

**Affirm Denies Plaintiff's Credit Applications in September and December 2021**

74.    On or about September 19, 2021, and December 10, 2021, Plaintiff applied for credit with Affirm. After submitting a credit application, Plaintiff received correspondence from Affirm informing him that his credit application was denied based on the contents of his credit reports.

75.    Affirm relied on the contents of the merged and mixed credit reports and files that were sent to it by one or more Defendants at the time it denied Plaintiff's credit application on or about September 19, 2021, and December 10, 2021.

76.    Defendants' inaccurate credit reporting adversely impacted Plaintiff's credit scores and caused his credit application to be denied by Affirm.

**University Federal Credit Union Denies Plaintiff's Credit Card Application in November 2021**

77.    On or about November 1, 2021, Plaintiff needed a credit card and applied online for a University Federal Credit Union card. After submitting a credit application, Plaintiff received correspondence from University Federal Credit Union informing him that his credit application was denied based on the contents of his credit reports.

78.    University Federal Credit Union relied on the contents of the merged and mixed credit reports and files that were sent to it by one or more Defendants at the time it denied Plaintiff's credit application on or about November 1, 2021.

79.    Defendants' inaccurate credit reporting adversely impacted Plaintiff's credit scores and caused his credit application to be denied by University Federal

Credit Union.

**Randolph-Brooks Federal Credit Union Denies Plaintiff's Attempt to Refinance His Car Loan at a Better Rate.**

80.   On or about January 26, 2022, Plaintiff applied to refinance his automobile loan.    After submitting a credit application, Plaintiff received correspondence from Randolph-Brooks Federal Credit Union One ("Randolph-Brooks") informing him that his credit application was denied based on the contents of his credit reports.

81.   Randolph-Brooks relied on the contents of the merged and mixed credit reports and files that were sent to it by one or more Defendants at the time it denied Plaintiff's credit application on or about January 26, 2022.

82.   Defendants' inaccurate credit reporting adversely impacted Plaintiff's credit scores and caused his credit application to be denied by Randolph-Brooks.

**Discover, Capital One, and American Express All Denied Plaintiff's Credit Applications on February 27, 2022**

83.   On or about February 27, 2022, Plaintiff needed one or more credit cards and applied for same with Discover, Capital One, and American Express. Shortly thereafter, Plaintiff received correspondence from all three entities informing him that his credit applications were denied based on the contents of his Equifax, Experian, and Trans Union credit reports, which were all mixed at the time.

84.   Discover, Capital One, and American Express all relied on the contents of the merged and mixed credit reports and files that were sent to them by one or more Defendants at the time they denied Plaintiff's credit applications on or about February 27,

2022.

85.    Defendants' inaccurate credit reporting adversely impacted Plaintiff's credit scores and caused his credit application to be denied by Discover, Capital One, and American Express.

### Plaintiff Was Forced to Obtain A "No Credit Check" Sky High Interest Loan From "The Cash Store" On March 1, 2022

86.    Having run out of other options, on or about March 1, 2022, Plaintiff entered into an onerously expensive Consumer Installment Loan Agreement with "The Cash Store" at an annual percentage rate of $580.17%. While the amount financed was only $1,310.00 over six months, Plaintiff was required to pay interest charges of $2,541.21, nearly double the amount financed, for total payments of $3,851.21 over 12 payments over $320 each.

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. |
|---|---|
| 580.17% | $2,541.21 |

| Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|
| $1,310.00 | $3,851.21 |

| Payment Amount | When Payments are Due |
|---|---|
| $320.94 | 03/15/2022 |
| $320.94 | 03/29/2022 |
| $320.94 | 04/12/2022 |
| $320.94 | 04/26/2022 |
| $320.94 | 05/10/2022 |
| $320.94 | 05/24/2022 |
| $320.94 | 06/07/2022 |
| $320.94 | 06/21/2022 |
| $320.94 | 07/05/2022 |
| $320.94 | 07/19/2022 |
| $320.94 | 08/02/2022 |
| $320.87 | 08/16/2022 |

87. The sole reason Plaintiff used The Cash Store for this loan was because it was the only provider he could find that didn't require a credit check from one or more of the Defendants.

88. Plaintiff accepted the Cash Store loan agreement because Equifax, Experian, and Trans Union's inaccurate credit reporting adversely impacted Plaintiff's credit score so much that this was the only loan available to him at the time.

### Plaintiff's Mixed Credit Files as of November 2021

89. As it turns out, for most of Plaintiff's adult life to date, he has been denied credit reports of his own because Equifax, Experian, and Trans Union all failed to recognize him as his own person by merging his data within credit reports anchored with his twin sister's Social Security number.

90. In the summer of 2021, Plaintiff's twin sister was informed by some finance directors at automobile dealerships that Plaintiff's automobile loan with Randolph-Brooks Federal Credit Union was reporting on her credit reports, thus lowering her credit scores. Moreover, Plaintiff was not receiving the proper credit for the timely payments he was making.

91. Being rightfully concerned about his own problems getting his first car loan back in 2019, and worried about both his situation and his sister's, Plaintiff began to work in concert with his twin sister to gain a better understanding of the credit related problems both were experiencing.

92. On or about November 14, 2021, Plaintiff, along with his twin sister,

both filled out a separate FTC approved "Annual Credit Report Request Form" (ACRRF) requesting reports from Equifax, Experian, and Trans Union. These ACRRF forms were sent via certified mail.

93.     Plaintiff immediately experienced problems with his simple request, which was made pursuant to his right under federal law. First, he did not receive a credit report or file from Trans Union, apparently because it merged his personal and credit data with his twin sister's personal and credit data. Instead, Trans Union sent Plaintiff a postcard stating: "Based on the information you provided, we are unable to locate a credit report for you." (Trans Union File Number: 426959386).

94.     Second, he received a sparsely thin report from Equifax, which was anchored with his SSN but had lots of his twin sister's information mixed within it and failed to contain much of his credit related information and accounts.

95.     Third, Experian sent a merged and mixed report dated November 22, 2021, which was anchored with his twin sister's SSN and also contained mostly her information but some of his. For example, Experian addressed the report to Plaintiff and sent it to him at his address in Kyle, Texas (Credit Report #0180-5023-70 dated November 22, 2021):



## Your Credit Report
Report # 0180-5023-70 for Nov 22, 2021

# Hi, Adairius D. Welcome to your Credit Report.

96. But the Experian report made no sense because it was riddled and rife with his sister's car loan, student loan, and numerous other accounts, former employer's, former addresses lived, and sister's phone numbers. Experian had also published this merged report containing his information to numerous entities.

**Disputes of Trans Union's Reporting**

97. After Plaintiff received a postcard stating: "Based on the information you provided, we are unable to locate a credit report for you." (Trans Union File Number: 426959386), he began disputing the situation with Trans Union in writing.

98. Despite amassing a significant credit history during his adult life to the present, Trans Union has never recognized Plaintiff as his own person. Rather, Plaintiff's credit file has been inextricably merged within his twin sister's report despite his pleas for this significant error to be corrected.

99. For example, on December 9, 2021, Plaintiff drafted a very detailed

letter (sent via certified mail and receipt confirmed) concerning Trans Union's Report File Number 385066264, which began with the following details and protest:

> My name is Adairius De'Airrick Norwood. I recently exercised my right to my free annual credit report via the Annual Credit Report Request Service and it was certified delivered (USPS Certified 9407111898765851537083) on November 19, 2021. Next, by letter dated November 22, 2021, your company recently informed that "Based on the information you provided, we are unable to locate a credit report for you." See File Number: 426959386. TransUnion also stated that it "maintains credit reports on individuals who have existing credit histories." In fact, I do have a substantial credit history, but unfortunately TransUnion has mixed my data in with that of Adair Da' Ann Norwood my twin sister.

100.    Trans Union's November 30, 2021 report was obtained online vis-à-vis the annual credit report website online portal. Remarkably, the first page of the 82-page report began like this:

## Personal Credit Report for:
## ADAIRIUS NORWOOD

101.    But nearly the entirety of the remainder of the report related to his twin sister. On the same first page of this report stating "you have been on our files since 04/07/2015, the report indicated that it was anchored by his twin sister's SSN and then stated:

**Name**

ADAIR D. NORWOOD

102.    The report then, also inexplicably, gave two alleged "AKAs" as follows:

ADAIR DA ANN NORWOOD

**AKA**

ADAIRIUS NORWOOD

103. Next, within his December 9, 2021 dispute letter, Plaintiff complained to Trans Union that much of his information was merged within what was apparently his twin sister's report because it was anchored with her SSN, not his own.

104. Within his dispute letter, Plaintiff identified much of his information and asked Trans Union that he be given his own separate report with the identified information that was his and further requested that the remainder, which he believed belonged to his twin sister, be disentangled from his information.

> Errors made by your company are preventing me from obtaining credit and have also lowered my credit scores and ratings. These errors are driving up my financial costs and forcing me to make extra credit inquiries. Consequently, I need all errors and mix-ups to be fixed immediately, and I need a credit report of my own based on my history, not my sister's. Below I have identified numerous items that are being reported incorrectly on my sister's report. Please review the following items, make the appropriate additions/corrections, and send me a complete copy of my updated credit file and credit report as soon as possible. Credit Report File No. 385066264 states that it: "Personal Credit Report for: ADAIRIUS NORWOOD" … of course this is correct but should be on my report not hers. TransUnion also states that "Our goal is to maintain complete and accurate credit information. It's our commitment to you." I need my own report and credit file, so please meet your goals and help make things right.

105. In one specific example, Plaintiff identified his car loan:

> This is my car loan: RANDOLPH-BROOKS FCU; Account #: 21266****; Address PO BOX 2097 UNIVERSAL CTY, TX 78148-2097; Phone (800) 580-3300; Monthly Payment $406; Date Opened 04/09/2020. However, you have attributed it to my sister.

106. Plaintiff included copies of both his and his twin sister's Texas driver's licenses and Social Security cards to demonstrate clearly to Trans Union that they were indeed two separate people.

107. Despite Plaintiff's pleas and requests, Trans Union apparently made no attempt to rectify the situation, nor did it respond to his letter.

108. On or about February 15, 2022, having been ignored, Plaintiff drafted another dispute letter (sent via certified mail and receipt confirmed):

My name is Adairius De'Airrick Norwood. I previously wrote to you in December 2021. This is a follow-up to my prior letter because you have failed to notify me that you have fixed all the errors I previously identified. Here is a recap. As you know, I previously exercised my right to my free annual credit report via the Annual Credit Report Request Service and it was certified delivered (USPS Certified 9407111898765851537083) on November 19, 2021. Next, by letter dated November 22, 2021, your company recently informed that "Based on the information you provided, we are unable to locate a credit report for you." See File Number: 426959386. TransUnion also stated that it "maintains credit reports on individuals who have existing credit histories." In fact, I do have a substantial credit history, but unfortunately TransUnion has mixed my data in with that of Adair Da' Ann Norwood my twin sister.

109.     Plaintiff again requested that Trans Union stop mixing and merging his personal, financial, and other credit information with his sister's:

Again, errors made by your company are preventing me from obtaining credit and have also lowered my credit scores and ratings. These errors are driving up my financial costs and forcing me to make extra credit inquiries. Consequently, I need all errors and mix-ups to be fixed immediately, and I need a credit report of my own based on my history, not my sister's. Below I have identified numerous items that are being reported incorrectly on my sister's report. Please review the following items, make the appropriate additions/corrections, and send me a complete copy of my updated credit file and credit report as soon as possible. Credit Report File No. 385066264 states that it: "Personal Credit Report for: ADAIRIUS NORWOOD" ... of course this is correct but should be on my report not hers. And I say it's her report, because it primarily contains most of her information, not mine. TransUnion also states that "Our goal is to maintain complete and accurate credit information. It's our commitment to you." I need my own report and credit file, so, again, please meet your goals and help make things right.

110.     Plaintiff included both the relevant credit report number and file number for ease of reference for Trans Union, along with his DOB and SSN. Plaintiff next repeated his prior protests again showing the information that belonged to him, and not his sister. Plaintiff also again included copies of both his and his twin sister's Texas driver's licenses and Social Security cards to demonstrate for Trans Union that they were indeed two separate people.

111.     Instead of properly reinvestigating Plaintiff's disputes, Trans Union began a rather strange attack on Plaintiff's dispute letters.

112.     Trans Union sent a one-page letter on February 26, 2022 and in it outrageously accused Plaintiff of possibly having had a "credit repair company" author the dispute letters previously sent to Trans Union, or otherwise having sent

"unauthorized" dispute letters. Remarkably, TransUnion also sent an identical letter to Plaintiff's twin sister, also accusing her of the same.

113. On or about May 5, 2023, Plaintiff responded to Trans Union as follows:

> My name is Adairius De'Airrick Norwood. I previously wrote to you in December 2021 and February 2022. I am in receipt of your one-page letter dated February 26, 2022. I have serious issues that you are continuing to ignore. You stated:

> We applaud your recent efforts to take charge of your credit. We want you to know we're on your side, and we're here to help support you on your path toward credit health.

> Thanks. I have been trying get things fixed, but it doesn't appear that you are "on my side" as you say because you continue to ignore me improperly and repeatedly. You haven't given any "support" to me on my "path toward credit health" as you say. Indeed, your actions have been quite the opposite. You seem determined to block my efforts.

> We recently received a request that included your information, but it didn't appear that you or a properly authorized third party sent it to us. We take the privacy and security of your data very seriously, so we won't process requests unless they come directly from you or an authorized third party. If you're working with a third party such as a credit repair company or "credit clinic," they have to identify themselves in their communications to us, and provide proof that you've authorized them to communicate with us on your behalf.

114. Plaintiff continued:

I have no idea where you get your information. I am <u>not</u> "working with" any so-called "credit repair company" or "credit clinic." Any such assertion or belief is patently false. Please inform as to the basis for your conclusions.

> It's important to know that if you see something on your TransUnion credit report that you believe is inaccurate, you can dispute it easily and securely on your own for free, without paying a fee to any company. Find out more about how to manage the information on your TransUnion credit report at transunion.com/repairletter.

115. Plaintiff further continued:

> You can count on us as a resource as you work to achieve your credit health goals - we want you to be able to get the financial opportunities you deserve.

You've done nothing to date to make me believe I can "count on you" "as a resource" to "achieve" my "credit health goals." Instead, you seem to appear to be actively ignoring good faith efforts to resolve the issues. Please do your job. I do want "the financial opportunities I deserve."

116.  Plaintiff again repeated all the information about the merging, mixing, and commingling that was occurring as he had previously.

117.  Finally, Plaintiff concluded this letter as follows:

Please immediately delete all my sister's accounts and other information from my report going forward, or just give me a report of my own. Also, please fix your files so I may be able to receive my annual report for free as is my right. Finally, pursuant to Texas Finance Code § 392.201, as a person with information within TransUnion's registry, I formally make this written request and demand for "a copy of all information" contained in TransUnion's files concerning me. Under Texas law, I have a right to this information no "later than the 45th day after the date of th[is] request…." Your 45-day limit expired long ago.

118.  Plaintiff included his Social Security card and driver's license as well.

119.  Remarkably, the only response Plaintiff received was a small postcard from Trans Union that was directed to his twin sister, but at his home address:



120.  Within the postcard, Trans Union stated:

Date Issued: 5/18/2022
Re: Proof of Address Unacceptable - Reason # 4

below.

Reason #4: Only one form of proof was provided. Two (2) acceptable documents are required. Please provide two (2) current documents from the list here: - Driver's License - State ID Card - Bank or Credit Union Statement - Cancelled Check - Government-Issued ID Card - Signed Letter from Homeless Shelter - Stamped P.O. Box Receipt - Utility Bill (Water, Gas, Electric, or Telephone) - Pay Stub. Be sure bank statements, utility bills, canceled checks and pay stubs are not more than 2 months old. All state-issued license and ID cards must be current and unexpired. P.O. box receipts and signed letters from a homeless shelter must be less than 1 year old. Electronic statements printed from a website cannot be accepted as proof of address.

121. Trans Union's response made no sense and left Plaintiff both confused and frustrated.

122. Subsequently, Plaintiff has attempted to obtain reports from Trans Union to no avail.

### Dispute of Experian's Reporting – October 2021

123. In or about October 2021, Plaintiff's twin sister sent an online dispute to Experian because Plaintiff's auto loan was mixed in with, and reporting on, her credit report. (Report # 0847-2623-22).

124. Remarkably, Experian didn't remove Plaintiff's auto loan account. Instead, Experian sent its "dispute results" confirming the alleged legitimacy of the account and sent those results to Plaintiff at his residence in San Marcos, Texas, addressing the letter to Plaintiff as well.

### Dispute of Experian's Reporting – January 2022

125. On or about January 6, 2022, Plaintiff sent a letter to Experian disputing information that was addressed to him and included his residence but was anchored with his twin sister's SSN, not his own.

126. In this letter, Plaintiff explained that information about his twin sister was located within this credit report. Plaintiff provided his full name, address, Social Security number, and date of birth. Additionally, he provided copies of her Texas driver's license and her Social Security card. Plaintiff also included both for his twin sister as well to further demonstrate for Trans Union that they were in fact two separate people.

127. Plaintiff further protested the use of his twin sister's information, including her current and former addresses, phone numbers, and employers, all of which do not belong to him. For example:

### Errors – "Your Personal Information" -- Names

The following names are not mine: "Adair D Norwood" "Adair Norwood" "Adair Daann Norwood" "Adair Da Norwood" and Adair Daan Norwood."

### Errors – "Your Personal Information" -- Addresses

Each of the Waco addresses listed are not mine. The remainder are mine.

### Errors – "Your Personal Information" – Telephone Numbers

All three of the "254" phone numbers listed are not mine. My phone number is 512-757-2872.

### Errors – "Your Personal Information" – "Former or current employers"

All three of the listed employers – Providence Med Care; R-1; Providence Hospital and MHMR do not belong to me.

128. Plaintiff identified other information that was his, or information that was apparently missing, as follows:

### Accounts – Mine

This is my car loan: RANDOLPH-BROOKS FCU; Account #: 21266****; Address PO BOX 2097 UNIVERSAL CTY, TX 78148-2097; Monthly Payment $406; Date Opened 04/09/2020. However, you have attributed it to my sister. It shows that she disputed it in October 2021 as not hers, yet it continues to be reported.

I also have a student loan with Texas Lutheran College with an account number ending in "4AD9" but that is not included in this Experian report for reasons that are unclear to me. Please add it if they are reporting to you.

129. Plaintiff identified other information that was not his:

**Errors – Accounts – Not Mine**

All of the remaining accounts listed in Report #0180-5023-70 are NOT mine.

**Errors – Adverse Accounts – Not Mine**

WEBBANK/FRESHSTART; Account #: 636992031320****; 6250 Ridgewood Road, St. Cloud, MN 56303. This account allegedly relates to a "Sales Contract" from November 2015. This is not mine. Please delete it immediately.

130.    Plaintiff next identified numerous hard credit pulls that were attributable to him, but noted that the remainder were not his, as follows:

**Credit Applications / Hard Inquiries – Mine**

The following were approved by me and belong on my credit report: CHUCK NASH SEGUIN via ODECHUCK NASH PRE OWNED; Location 838 W COURT ST SEGUIN, TX 78155; Requested On 02/07/2020; Phone (830) 433-9331; DT CREDIT, PO BOX 2997 Phoenix, AZ 85062, (888)418-1212; Date requested on 12/2/2019 and 3/27/2020; FIRST ADVANTAGE/RESIDENT DATA, 12770 Coit Rd, Suite 1000, Dallas, TX 75251 (800) 888-5773, Requested on 5/21/2021; CAPITAL ONE AUTO FINANCE, PO BOX 259407, Plano, TX 75025 (800) 946-0332, Date Requested 4/9/2020; GLOBAL LENDING SERVICES, 3399 Peachtree Rd. NE, Suite 400, Atlanta, GA 30326, (888) 508-2188; NCCINC/YAKLIN CHRUSLER D, 1550 W. Kingsbury Street, Seguin, TX 78155, Date Requested 4/9/2020; NOWCOM/WESTLAKE FINANCIAL, 4751 Wilshire Blvd., Los Angeles, CA 90010, Date Requested 3/16/2020 & 4/9/2020; SANTANDER CONSUMER USA, 5201Rufe Snow Dr. North Richland Hills, TX 76180, Ph: 866-923-9282, Requested on 3/16/2020; CARMAX, 225 Chastain Meadows Ct. NW, Kennesaw, GA 30244, Ph. 770-423-7908, Requested on 3/16/2020; 700 CREDIT/HEWITT AUTO PL, 847 N. Hewitt Dr., Hewitt, TX 76643, Requested on 4/4/2020.

Credit Applications / Hard Inquiries
– Mine

All of the remaining inquiries listed within the referenced report <u>do not</u> belong to me so please remove them.

131.    Plaintiff included copies of both his and his twin sister's Texas driver's licenses and Social Security cards to demonstrate for Experian that they were indeed two separate people.

132.   On January 17, 2022, Experian sent its dispute results to Plaintiff purporting to have made changes and giving him his own independent report.

**Dispute of Equifax's Reporting Starting In September 2020**

133.   In September 2020, Plaintiff made a request to Equifax for his credit report and reported that whatever information Equifax was using was inaccurate.

134.   On or about September 26, 2020, Plaintiff received a letter from Equifax whereby it requested certain "identifying information." Equifax informed Plaintiff that it was "unable to locate a credit file in our database with the identification information you provided."

135.   As requested, Plaintiff provided Equifax with the requested information and assumed that Equifax would be reporting properly going forward. Unfortunately, this was not the case.

136.   Next, in November 2021, Plaintiff requested that Equifax send him his credit report so he could verify its accuracy. Unfortunately, Plaintiff discovered that his report was inaccurate. Consequently, on December 28, 2021, Plaintiff sent a dispute letter to Equifax.

137.   In his dispute letter, Plaintiff informed Equifax about various inaccuracies contained within his report. For example, three hard credit pulls were in fact attributable to his twin sister, not himself:

> The credit report you recently sent also lists three companies who have made "hard inquiries" which are attributed to me.  But the LL WACO INVESTMENTS LP with inquiries on June 18, 2021 & August 7. 2021 is not mine. And neither is the ORR MOTORS OF WACO TWO INC. inquiry made on June 26, 2021. Please remove them.

138.   Plaintiff also noted that certain key accounts were missing from his

Equifax report and informed Equifax of the following:

> I also have a student loan with Texas Lutheran College with an account number ending in "4AD9" but that is not included in my Equifax file for reasons that are unclear to me. Instead, it is listed in my sister's credit report.

> Also, this is my car loan: RANDOLPH-BROOKS FCU; Account #: 21266****; Address PO BOX 2097 UNIVERSAL CTY, TX 78148-2097; Phone (800) 580-3300; Monthly Payment $406; Date Opened 04/09/2020. I've made timely monthly payments related to this account since the inception. However, none of this information is on my credit report.

139.    Plaintiff included copies of both his and his twin sister's Texas driver's licenses and Social Security cards to demonstrate for Equifax that they were indeed two separate people.

140.    Plaintiff concluded this letter as follows:

> Finally, pursuant to Texas Finance Code § 392.201, as a person with information within Equifax's registry, I formally make this written request and demand for "a copy of all information" contained in Equifax's files concerning me. Under Texas law, I have a right to this information no "later than the 45th day after the date of the request…."

141.    Unfortunately, Equifax did not respond to Plaintiff's dispute letter.

142.    Next, on February 21, 2022, Plaintiff sent another dispute letter to Equifax essentially repeating all the problems and inaccuracies highlighted in the prior dispute, which was ignored.

143.    Plaintiff again included copies of both his and his twin sister's Texas driver's licenses and Social Security cards to demonstrate for Equifax that they were indeed two separate people.

144.    Next, on or about March 14, 2022, Equifax acknowledged that Plaintiff's car loan with Randolph-Brooks was not being properly reported and it was added to Plaintiff's credit file and report.

145. However, Equifax refused to delete his twin sister's auto loan credit inquiries for LLWACO INVESTMENTS (June 18, 2021 and August 7, 2021) and ORR MOTORS OF WACO (June 26, 2021).

## The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

146. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

147. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency- created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

148. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

149. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

150. Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic

form.

151.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

152.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

153.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

154.    The data furnishers then have an obligation under the FCRA to conduct a reasonable investigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

155.    Once the data furnisher completes its investigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**The Credit Bureaus' Responses to Plaintiff's Various Disputes**

156.    On multiple occasions between 2020 and 2022, Equifax, Experian, and Trans Union failed to respond to Plaintiff's multiple disputes within 30 days, as

mandated by the FCRA, after receiving such disputes and the supporting documentation Plaintiff attached thereto and failed to conduct *any* reinvestigations of the specific information that Plaintiff disputed as inaccurate in his credit file and report and as not belonging to him.

157. In regard to the disputes that Equifax and Experian did reinvestigate and respond to, both Equifax and Experian violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit files and reports after receiving notice of such inaccuracies; by failing to conduct lawful reinvestigations; by failing to forward all relevant information to the respective furnishers; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files and reports.

158. To date, Trans Union has failed to reinvestigate even a single one of Plaintiff's disputes, in violation of 15 U.S.C. § 1681i(a)(1)(A).

159. To date, neither Equifax, Experian, nor Trans Union have corrected or removed all of the personal identification information, credit accounts, and hard inquiries disputed by Plaintiff, which belong to his twin sister, and which continue to appear in Plaintiff's Equifax, Experian, and Trans Union credit reports.

## DAMAGES

### Actual Damages

160. Plaintiff has suffered, continues to suffer, and will suffer future damages, including the loss and denial of credit, lost credit opportunities, damage to reputation, invasion of privacy, emotional distress, including stress, anxiety, pain,

anguish, physical illness, embarrassment, humiliation and constant and continuing stress, all as a consequence of having his credit file information inextricably merged within his twin sister's credit file and reports. Plaintiff has also expended significant time and money disputing and trying to correct the inaccurate reporting.

161. As a result of the Defendants' conduct, action, and inaction, Defendants caused Plaintiff repeated credit denials, all outlined above. Every time over the last nearly two (2) years that Plaintiff has applied for credit cards or installment loans where the creditor requested Plaintiffs' various credit reports, Plaintiff has been rejected due to the inaccurate credit information contained within his, but technically his twin sister's, credit file and reports.

162. For example, as detailed above, each time Plaintiff tried to refinance his car at a lower rate, he was rejected despite the low interest rate environment others were enjoying. Plaintiff was even forced to take on an outrageously expensive "Cash Store" loan at an annual percentage rate exceeding 580%!

163. Defendants have also violated Plaintiff's privacy. For example, for most of Plaintiff's adult life, but increasingly over the last two (2) years, Defendants disseminated Plaintiff's information without his knowledge or authorization to over a few dozen or more of his twin sister's potential creditors when she applied for credit lines and other financing. This was very upsetting to Plaintiff. Defendants also sent reports containing his information to his twin sister. They even sent correspondence meant for him to his twin sister's house.

164. While Plaintiff and his twin sister get along just fine, Adairius prefers

to keep his finances private. He's been upset that Defendants merged or mixed his information and showed his sister his credit history and he likewise felt uncomfortable viewing his twin sister's personal and credit information when Defendants sent her reports to him. Just because they were family members and twins does not make it acceptable for Defendants to violate Plaintiff's and his twin sister's right to privacy in their credit information and financial affairs.

165. Defendants' ongoing refusal to reinvestigate Plaintiff's concerns and correct his reports caused extreme frustration, stress, anxiety, and annoyance to Plaintiff. Also, although rationally he knew that it was the Defendants' fault, not his, he still felt disappointed in himself and depressed. This ongoing credit nightmare has impeded Plaintiff's ability to move forward with his young adult life and reduced his chances of getting on a firm financial footing.

166. Plaintiff's personal life has also been affected, specifically with regard to his current and past girlfriends. Plaintiff finds it especially embarrassing when he's not able to access credit in order to attempt to build a better relationship financially so he can give a better appearance of financial strength for their partnerships on certain life events (vacations, meals and the like).

167. Plaintiff has also experienced nervousness, restlessness, and even panic leading up to virtually any credit situation.

168. Plaintiff has also had trouble concentrating, insomnia and tiredness, and a lack of motivation as a direct result of his credit difficulties caused by Defendants. After yet another credit denial, sometimes Plaintiff feels and thinks

about what the point of graduating was and what the point of continuing to make money is while still being hamstrung due to his ongoing credit issues caused by the merged files.

169. Defendants also made Plaintiff physically ill, including the triggering of literal headaches and extreme tension at times.

170. Finally, Defendants actions and inactions caused Plaintiff to suffer emotional distress, including stress, anxiety, and embarrassment, as described throughout this Complaint.

171. Plaintiff continues to experience extreme anxiety, frustration, stress, depression and even embarrassment about his financial reputation and future.

172. Defendants' reports about Plaintiff remain inaccurate and he feels trapped, hopeless and depressed, and unable to move forward with his financial life as a direct results of Defendants actions and inactions.

173. All of Plaintiff's damages were foreseeable to Defendants, who know from many years of past litigation over their wrongful verification and dissemination of inaccurate information the devastating consequences that false credit reporting can have on consumers.

## Punitive Damages

174. Based on a review of public record lawsuit filings, Defendants each have long histories of wrongful and inaccurate credit reporting, including mixing and merging two different consumer's credit files and reports.

175. For decades, consumers, state attorneys general, and regulatory

agencies have been suing Defendants for their refusals to assure the maximum possible accuracy of their reports and for their refusals to conduct reasonable reinvestigations of consumers' disputes.

176.    Defendants' unlawful policies and procedures evince willfulness and reckless disregard for the rights and interests of consumers, which directly lead to the injuries suffered by Plaintiff as described herein.

**CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

177.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-176 as if fully stated herein.

178.    Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

179.    As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; detriment to his credit rating and debt-to-income ratio; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit

denials and constant stress of having another consumers' personal and credit account information mixed into his credit files.

180. Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

181. Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

182. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-176 as if fully stated herein.

183. Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit file after they received notice of such inaccuracies; by failing to conduct a lawful reinvestigation of disputed personal information, credit accounts, and hard inquiries within the 30-day time frame outlined in the FCRA; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file and reports.

184. As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; detriment to his credit rating and debt-to-income ratio; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and constant stress of having another consumers' personal and credit account information mixed into his credit file and reports.

185. Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

186. Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C.§ 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681b(a)**
**Furnishing a Credit Report Without a Permissible**
**Purpose**
**(Third Claim for Relief Against Defendants**
**Equifax, Experian, and Trans Union)**

187. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-176 as if fully stated herein.

188. This action involves the willful, knowing, and/or negligent violation of

the FCRA relating to the dissemination of consumer credit and other financial information.

189. Plaintiff is a "consumer" as defined by the FCRA.

190. Defendants Equifax, Experian, and Trans Union are consumer reporting agencies that furnish consumer reports as defined and contemplated by the FCRA.

191. The FCRA prohibits any consumer reporting agencies from furnishing a consumer report unless they have a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

192. On multiple occasions, Defendants Equifax, Experian, and Trans Union furnished Plaintiff's credit reports, which at the time was mixed with his twin sister's credit report and technically was his twin sister's report but with his personal and credit information mixed in, to various creditors without a permissible purpose in response to applications of credit initiated by Adair Da'Ann Norwood, which did not involve Plaintiff and which Defendants Equifax, Experian, and Trans Union therefore had no reason to believe that the various creditors intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

193. As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the

inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and constant stress of having another consumers' personal and credit account information mixed into his credit file and reports.

194. Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

195. Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a) Determining that each Defendant negligently and/or willfully violated the FCRA;

b) Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c) Awarding Plaintiff reasonable attorneys' fees and costs from each Defendant as provided by the FCRA; and

d) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

196.    Plaintiff demands a trial by jury.


Dated: May 25, 2023

*s/ Tod A. Lewis*
Tod A. Lewis, TX Bar No. 24091999
TOD LEWIS LAW, PLLC
13267 Darwin Lane
Austin, TX 78729-7495
Telephone: (512) 739-0390
Fax: 1 (737) 205-1291
tod@texasfaircredit.com

*s/ Hans W. Lodge*
Hans W. Lodge, MN Bar No. 0397012
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 607-7794
Fax: (612) 584-4470
hlodge@bm.net

*Attorneys for Plaintiff*